

CLERK'S OFFICE
A TRUE COPY
Dec 09, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

❐ Original          ❐ Duplicate

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.   25   MJ   212 |
| Target Device, currently located at 1400 Northview | ) | |
| Rd., Waukesha, Wisconsin 53188, more fully | ) | |
| described in Attachment A | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Wisconsin _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ 12/23/2025 _____ *(not to exceed 14 days)*
❐ in the daytime 6:00 a.m. to 10:00 p.m.   ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. William E. Duffin _____.
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❐ for _____ days *(not to exceed 30)*   ❐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     12/09/2025 at 9:45 a.m.          *William E. Duffin*
                                                            *Judge's signature*

City and state:     Milwaukee, Wisconsin          Honorable William E. Duffin, U.S. Magistrate Judge
                                                            *Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

The property to be searched is described as follows: an Apple iPhone with an Apple logo on the back, and having a black Otterbox cover, hereinafter referred to as the "**TARGET DEVICE**" (see *Figures 1* and *2*).



| *Figure 1* | *Figure 2* |

The "**TARGET DEVICE**" is currently located at the Waukesha County Drug Task Force, 1400 Northview Rd., Waukesha, Wisconsin 53188, which is in the Eastern District of Wisconsin. This warrant authorizes the forensic examination of the "**TARGET DEVICE**" for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1.      All records on the "**TARGET DEVICE**," described in Attachment A, that relate to violations of 21 U.S.C. §§ 846, 843(b), and 841(a)(1) (i.e., the Subject Offenses), and involve Dante R. MCDONALD, including, but not limited to:

      a.  any documents and communication related to the Subject Offenses;

      b.  lists of contacts and related identifying information;

      c.  any information related to criminal activity and co-conspirators (including names, addresses, phone numbers, or any other identifying information);

      d.  any information recording schedule or travel;

      e.  all bank records, checks, credit card bills, account information, and other financial records;

      f.  Photographs and/or videos depicting evidence of the Subject Offenses;

      g.  Any evidence related to either the ownership, purchase, or possession of items used in the Subject Offenses;

      h.  Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses

2.      Evidence of user attribution showing who used or owned the "**TARGET DEVICE**" at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.



CLERK'S OFFICE
A TRUE COPY
Dec 09, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of                )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*     )          Case No.   25    MJ    212
Target Device, currently located at 1400 Northview Rd.,    )
Waukesha, Wisconsin 53188, more fully described in    )
Attachment A                                  )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of a controlled substance; use of a communications facility to facilitate |
| 21 U.S.C. § 843(b) | the distribution of a controlled substance; and conspiracy to distribute a controlled |
| 21 U.S.C. § 846 | substance. |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

John Kopatich, DEA Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date:  _____ 12/09/2025 _____

_____
*Judge's signature*

City and state:  _____ Milwaukee, Wisconsin _____

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH WARRANT**

I, John Kopatich, being first duly sworn on oath, on information and belief state:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a certified law enforcement officer for the Waukesha County Sheriff's Department and currently assigned to the Waukesha County Drug Task Force, DEA Group 69. I have worked full-time as a law enforcement officer for the past twenty-six (26) years.

3.      I have served as a federally deputized Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) from January 2015 until January 2022. I was again federally deputized as a Task Force Officer with the Drug Enforcement Administration on January 19, 2023 and I am currently in that position.

4.      As a federal law enforcement officer, I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws including Title 21, United States Code, Sections 841(a)(1), 843(b), and 846 (possession with intent to distribute a controlled substance, unlawful use of a communication facility (including the mails) to facilitate the distribution of a controlled substance, and conspiracy to possess with intent to distribute a controlled substance), and other related offenses. I have had both formal training and have participated in numerous complex drug-trafficking investigations, including ones using wiretaps. More specifically, my training and experience includes the following:

a. I have used informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b. I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances;

c. I have participated in several search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

d. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

e. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

f. I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

g. I know that drug traffickers commonly have in their possession, and at their residences and other storage locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

h. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials;

i. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

j. I know large-scale drug traffickers maintain on-hand large amounts of U.S. currency to maintain and finance their ongoing drug business;

k. I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile

2

machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

l.  I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

m.  I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing, and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses, or other locations over which they maintain dominion and control;

n.  I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

o.  I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

p.  I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization; and

q.  I know drug traffickers take (or cause to be taken) and maintain photographs of themselves, their associates, their property, and their drugs.

3

5.      This affidavit is based upon my personal knowledge, training, and experience, and on information reported to me by other federal, state, and local law enforcement officers in the course of their official duties, all of whom I believe to be truthful and reliable.  This affidavit is also based upon official records, witness statements, recorded statements, surveillance, and public records, which I consider to be reliable as set forth herein.  Throughout this affidavit, reference will be made to case agents and/or investigators. Case agents and/or investigators are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      I have participated in several narcotics and firearms trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices.  On many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

7.      Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware and software that are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about crime.

4

8.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute a Controlled Substance), 843(b) (Unlawful Use of a Communication Facility [including the mails] to Facilitate the Distribution of a Controlled Substance), and 846 (Conspiracy to Distribute and Possession with the Intent to Distribute Controlled Substances) have been committed, are being committed, and/or will be committed by Dante R. MCDONALD ("MCDONALD") (DOB: XX/XX/1979).

9.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

10.      The property to be searched is described as follows: an Apple iPhone with an Apple logo on the back, and having a black Otterbox cover, hereinafter referred to as the "**TARGET DEVICE**."

11.      The "**TARGET DEVICE**" is currently located at the Waukesha County Drug Task Force, 1400 Northview Rd., Waukesha, Wisconsin 53188, which is in the Eastern District of Wisconsin.

12.      The applied-for warrant would authorize the forensic examination of the **TARGET DEVICE** for the purpose of identifying electronically stored data more particularly described in Attachment B.

5

## PROBABLE CAUSE

*Background*

13.    In late 2023, the DEA Milwaukee Resident Office (RO) commenced an investigation into a suspected cocaine-trafficking organization that operated primarily in north Texas and Milwaukee, Wisconsin.  A confidential source (CS-1)[1] explained that George WOODS and his associates were transporting kilogram quantities of cocaine from Texas to Milwaukee for further distribution.  CS-1 identified Dante R. MCDONALD (a/k/a "Bunk") as an individual who helped WOODS distribute cocaine in the Milwaukee, Wisconsin area.  Investigators also identified locations in both the Fort Worth, Texas and Milwaukee, Wisconsin areas where the WOODS drug-trafficking organization (DTO) was believed to have stored cocaine and cocaine proceeds. Specifically, in the Milwaukee area, investigators identified, among other places, 3817 N. Sherman Blvd., Milwaukee, Wisconsin and 915 N. 24th Street, Apt. 11, Milwaukee, Wisconsin as such places.  CS-1 recalled obtaining drugs from MCDONALD at 915 N. 24th Street, Apt. 11.  Utility and Wisconsin Department of Transportation records indicated that MCDONALD resided at 915 N. 24th Street, Apt. 11.  Investigators also observed MCDONALD at this location.  On different occasions, investigators spotted MCDONALD delivering and retrieving items from 3817 N. Sherman Blvd. as well.  On July 31, 2024, the DEA executed warrants to search residences

_____

[1] For several reasons, your Affiant believes CS-1's information was reliable and credible. Substantial parts of CS-1's information have been independently corroborated and verified by law enforcement. CS-1 made direct observations, which were further corroborated and verified by law enforcement. CS-1's information has been consistent with information obtained from travel records, telephone toll records, social media records, public databases, and surveillance. CS-1 has also provided information on violent crimes unrelated to this investigation, leading to the arrests of multiple suspects. CS-1 has prior convictions for theft, possession of controlled substances, possession of a firearm by a felon, manufacture or deliver controlled substances, and parole violations. CS-1 was cooperating for financial compensation.

6

(including the two residences referenced above) in Texas and Wisconsin linked to the WOODS DTO. As detailed below, the searches yielded evidence of drug trafficking, including the seizure of significant quantities of cocaine and firearms.

*Traffic Stop*

14.     Contemporaneous with the residential searches on July 31, 2024, the DEA coordinated with the Effingham County Sheriff's Office (Illinois) to conduct a traffic stop on MCDONALD, who was *en route* from Texas to Wisconsin. Investigators determined MCDONALD's location based on the authorized collection of location data from his cell phone and physical surveillance. MCDONALD was driving a black Chevrolet Suburban on Interstate 57. At approximately 9:00 a.m., an Effingham County (Illinois) Sheriff's Office deputy was patrolling Interstate 57 near mile post 162. Around this time, the deputy observed a black Chevrolet Suburban, displaying Texas registration: VJC2349, traveling ahead of him. While using a radar and pacing the Suburban, the deputy determined that the Suburban was traveling at 70 m.p.h., which was above the posted 65 m.p.h. speed-limit. The Suburban then changed lanes without signaling at least 200 feet before moving from the left-hand to the right-hand lane. Based on these observed violations of the Illinois Vehicle Code (i.e., speeding and improper use of turn signal), the deputy activated his marked unit's emergency lights to conduct a traffic stop on the Suburban. The driver of the Suburban complied and pulled over at approximately the 164-mile post on Interstate 57.

15.     The deputy communicated with the Suburban's driver, who was identified as MCDONALD. The deputy also observed a front-seat passenger, later identified as Ashley Reiter, and a juvenile female subject, who was later determined to be Reiter's daughter. The deputy observed that Reiter refused to look at him as she immediately proceeded to call someone on her

7

cell phone.  MCDONALD told the deputy that they were returning home to Wisconsin and that the Suburban belonged to a friend.  The deputy asked MCDONALD to come to his marked unit so that he could issue MCDONALD a written warning for the traffic violations.  While MCDONALD sat in the marked unit's front passenger seat, the deputy asked MCDONALD how long he lived in Wisconsin.  MCDONALD responded that he had lived in Wisconsin his entire life.  MCDONALD said Reiter was his friend, and that the female juvenile was Reiter's daughter.  When the deputy inquired about the trip, MCDONALD explained that he was traveling from the Dallas, Texas area where they had been visiting Reiter's friends.  The deputy noted that the Suburban contained very little luggage, which he believed was odd given MCDONALD's explanation that they had been on a lengthy road trip.

16.    As the deputy was preparing MCDONALD's written warning, a canine-enforcement officer had his state-certified narcotics-detecting K9 "Siren" conduct a free-air sniff of the Suburban.  K9 "Siren" alerted to the odor of narcotics emanating from inside the Suburban. The deputy told MCDONALD that K9 "Siren" alerted to the Suburban and asked him if the vehicle contained anything illegal.  MCDONALD responded that the Suburban contained nothing illegal. The deputy had MCDONALD remain in the marked vehicle while he and other officers conducted a search of the Suburban.

17.    An initial search of the Suburban's open areas yielded no evidence of contraband or other evidence of drug trafficking. Upon closer inspection, however, the officers observed post-manufacture tampering inside the Suburban.  Specifically, when the officers pulled back the carpet beneath the third-row seats, they found a jagged-cut panel with hinges and wiring.  Based on their training and experience, the officers believed they had found an access panel to a post-manufacture hidden compartment.  When an officer used a borescope to reveal the contents of the hidden

8

compartment, he observed several vacuum-sealed rectangular packages, which appeared to be kilogram-quantities of illegal drugs. The officers subsequently transported the Suburban to a nearby towing company where the officers opened the Suburban's hidden compartment and recovered 15 numbered, vacuum-sealed packages, each weighing approximately a kilogram and each bearing an "811" stamp. The 15 kilogram-sized bricks contained a white, powdery substance that field-tested positive for the properties of cocaine.

18. Investigators subsequently arrested MCDONALD. Incident to MCDONALD's arrest, DEA Task Force Officers (TFOs) seized an Apple iPhone, having a black Otterbox case (see *Figures 1* and *2*) (the "**TARGET DEVICE**"), which was in MCDONALD's possession. The TFOs had observed MCDONALD holding the "**TARGET DEVICE**" during the initial portion of the above-referenced traffic stop.

 

*Figure 1*          *Figure 2*

9

19.     Investigators conducted a post-*Miranda* interview of MCDONALD while he was inside the deputy's marked unit.  MCDONALD said he had driven from Haslet, Texas (a city within the Dallas-Fort Worth metroplex), where he and Reiter had been visiting friends. MCDONALD said Reiter has accompanied him on previous trips to Texas because Reiter would visit family there.  MCDONALD said on either July 27 or July 28, 2024, they had visited a residence located at 1820 Lavin Plaza, Haslet, Texas.  MCDONALD said they left Texas the previous day (i.e., July 30, 2024), and were *en route* to Wisconsin when they decided to spend the night at the Days Inn Hotel, room 210, in Effingham, Illinois. MCDONALD said that although the Suburban belonged to someone else ("Kenneth Beverly"), he drove it often, he would keep it for extended periods of time, and would occasionally make the monthly payments on the vehicle. MCDONALD was reluctant to provide further details about his Texas trip.

20.     Investigators took MCDONALD to the Effingham County Jail where they resumed his post-*Miranda* interview.  MCDONALD said his current address was 3817 North Sherman Blvd., Milwaukee, Wisconsin 53216.  He said he had left Milwaukee, Wisconsin late the previous Saturday and had arrived in Texas on Sunday.  MCDONALD denied knowledge of the cocaine concealed inside the Suburban.  He said that had he been aware of the concealed compartment, he would have told investigators how to open it.  MCDONALD initially indicated that he only drove the Suburban periodically, but later admitted to routinely driving the Suburban.  He said he did not have any other vehicle.

21.     MCDONALD said he had traveled to Texas approximately ten times over the past couple years, and that he had driven the Suburban to Texas about four to five times.  He said that he had been traveling to Texas once per month over approximately the past three months.

10

MCDONALD explained that during his last Texas trip, he left the Suburban at a residence located at 1820 Lavin Plaza, Haslet, Texas. He said he later retrieved the Suburban from the Haslet, Texas residence, and then drove it to another residence in Glenn Heights, Texas. He said he subsequently departed the Glenn Heights residence in the Suburban to return to Wisconsin. MCDONALD said he is typically told to park the Suburban at a tire shop located on N. 35th Street and W. Center Street in Milwaukee, Wisconsin when returning to Wisconsin from Texas.

22.     MCDONALD initially said he was not compensated for his trips to Texas, but later admitted to receiving $1,000 to drive from Wisconsin to Texas and back. He said the "people" at the tire shop paid him. At one point, when discussing the Milwaukee tire shop, MCDONALD remarked that he thought "it" would be in the tire. MCDONALD said he also took "it" to a residence in Brown Deer. When pressed to clarify what he meant by "it," MCDONALD refused to elaborate and ended the interview. Based on training and experience, investigators believe "it" was a reference to the contraband (i.e., cocaine) that MCDONALD had transported from Texas.

*Residential Searches*

23.     As noted above, investigators searched several residences on July 31, 2024, including the two residences affiliated with MCDONALD, i.e., 3817 N. Sherman Blvd., Milwaukee, Wisconsin and 915 N. 24th Street, Apt. 11, Milwaukee, Wisconsin. At 3817 N. Sherman Blvd., investigators found a 9mm Taurus handgun with a drum-styled magazine inside a box located in the main bedroom's closet. The investigators also found miscellaneous documents bearing MCDONALD's name throughout the main bedroom. Renee Crawford, who was MCDONALD's girlfriend, said she shared the main bedroom with MCDONALD. At 915 N. 24th Street, Apt. 11, investigators found a 9mm Jimenez Arms handgun under a couch cushion in the living room, approximately 191.3 grams of suspected cocaine in the living room closet, and

11

MCDONALD's Wisconsin driver's license in the bedroom. The investigators also found the keys for Apartment 22, which was a residential unit in the same complex as Apartment 11. The investigators obtained a warrant to search Apartment 22 as well. During the search of Apartment 22, investigators found approximately 393 grams of suspected marijuana in the living room, over 4 kilograms of cocaine (in brick form) and 37 pounds of suspected marijuana in the living room closet, a small amount (1.6 grams) of suspected cocaine in the kitchen cabinet, a Smith & Wesson 9mm handgun and Ruger .22 caliber rifle in the bedroom closet, 448 grams of suspected marijuana in a brown purse (also containing a prescription pill bottle bearing the name Angela Willis) hanging on the bedroom closet door, and miscellaneous documents, including mail from the Social Security Administration addressed to Darius Jarrett in the hallway closet. Of note, CS-1 previously told investigators that during a drug transaction with MCDONALD at Apartment 11, MCDONALD briefly left the apartment. After hearing footsteps in an above unit, MCDONALD soon returned with the drugs.

*Communications recovered from MCDONALD's iCloud account*

24.     Investigators obtained a warrant to search MCDONALD's iCloud account linked to the email address: dantemcdonald1979@gmail.com. On July 23, 2024, the investigators obtained information concerning the iCloud account from Apple, Inc. The iCloud account included several text communications between the user of the account (believed to be MCDONALD) and other cocaine-trafficking conspirators. For instance, on April 20, 2024, MCDONALD's iCloud account received an incoming text from (414) 379-1316, which included an image of the Cash App profile for "George Woods, $Pwoody49," indicating the text was from WOODS. On May 2, 2024, MCDONALD texted WOODS, "584,500 is what I got . . . Bout to pick up my riding buddy and we out!" On the same day, the investigators observed MCDONALD

at a residence in Brown Deer, Wisconsin before departing for Fort Worth in a white Chevrolet Suburban, indicating that MCDONALD was retrieving drug proceeds (i.e., $584,500) for transport to WOODS in Texas.

25.     Earlier in the year, on January 21, 2024, MCDONALD texted (414) 406-2832, which MCDONALD identified as "P2" in his contacts.  Based on information uncovered during the investigation, investigators learned that WOODS is sometimes identified by the moniker "P." In the text, MCDONALD wrote, "On my way back . . . 104k," indicating he had $104,000. MCDONALD later texts, "It gets no sweater than this . . ."  P2 texted in response, "I told you." MCDONALD then texted, "I'm at 70k," indicating he had $70,000.   In a series of text communications with P2 on February 15, 2024, MCDONALD sent images of what appeared to be kilogram bricks of cocaine.

*Additional information concerning MCDONALD's cocaine trafficking activity*

26.     A second confidential source (CS-2)[2] provided information specifically relating to MCDONALD's transportation of cocaine and drug proceeds to and from the Milwaukee area. According to CS-2, beginning in summer 2022, one to two times per month, MCDONALD, who CS-2 knew as "Buck," would transport drug proceeds from Milwaukee, Wisconsin to Fort Worth, Texas; and cocaine from Fort Worth, Texas to Milwaukee, Wisconsin.  According to CS-2, MCDONALD was paid $5,000 to $7,500 per trip.   Regarding the cocaine runs, CS-2 said

---

[2] For several reasons, your Affiant believes CS-2's information was reliable and credible. Substantial parts of CS-2's information have been independently corroborated and verified by law enforcement. CS-2 made direct observations, which were further corroborated and verified by law enforcement. CS-2's information has been consistent with information obtained from travel records, telephone toll records, social media records, public databases, and surveillance. CS-2 has prior convictions for drug trafficking, fraud, and resisting/failing to stop/fleeing. CS-2 is cooperating for consideration in a pending criminal case.

13

MCDONALD would transport between 15 and 30 kilograms of cocaine, which would be secreted inside the spare tire of an SUV. CS-2 said MCDONALD would load the cocaine inside the tires at a residence in Haslet, Texas. CS-2 said once MCDONALD arrived in Milwaukee, he would take the spare tire to Mr. P's Tire Shop, where someone would open it to allow MCDONALD access to the cocaine. MCDONALD would then store the cocaine either at 915 N. 24th Street, Apt. 22, Milwaukee, Wisconsin or in a storage unit located at 7677 W. Appleton Avenue, Milwaukee, Wisconsin.

## CONCLUSION

27.     Your Affiant believes MCDONALD used the "**TARGET DEVICE**" to facilitate drug trafficking and thus evidence of drug trafficking may likely be stored and recorded on the "**TARGET DEVICE**."

28.     Given the above-referenced search of MCDONALD's Apple iCloud account, he is known to historically store data related to cocaine distribution network, such as communications concerning the transport of suspected drug proceeds, and images of contraband, within his iCloud account. When MCDONALD was arrested, he was found to be in possession of an Apple iPhone (i.e., the "**TARGET DEVICE**"), which likely maintained access to an Apple account.

29.     Through my training, experience, and discussions with other experienced law enforcement officers, I am familiar with the ways in which drug traffickers and money launderers conduct their unlawful trade, including their methods of distribution, their use of communication devices, their use of coded communications to conduct their transactions, the employment of counter surveillance, their use of false or fictitious identities, and their use of various forms of electronic devices to store and/or conceal illegal activity.

14

30.     Based upon my training and experience, I know that individuals involved in drug trafficking and money laundering frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers of and co-conspirators in the distribution of controlled substances and money laundering.  I have also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs.

31.     Based on my training and experience, I am aware individuals involved in trafficking controlled substances and money laundering often possess a cellular device to compartmentalize their illegal activity and to avoid law enforcement detection.

32.     Based upon my training and experience, I believe it is common for crime suspects who possess illegal controlled substances to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances and proceeds of drug trafficking.  Furthermore, affiant believes it is common for these photographs and visual depictions to be kept and maintained on their cellular devices.

33.     Based upon the facts described above, to include (1) my knowledge of and experience confirming the prolific use of electronic devices to facilitate the possession and trafficking of controlled substances and money laundering; (2) MCDONALD's arrest in connection with the distribution of multi-kilogram quantities of suspected cocaine; and (3) an Apple iPhone (i.e., the "**TARGET DEVICE**") having been recovered from MCDONALD during that arrest, there is probable cause to believe that a search of the information contained within the above described "**TARGET DEVICE**" will produce evidence of a crime, namely evidence related to the possession and trafficking of controlled substances.

15

34.     The "**TARGET DEVICE**" was seized by the DEA during the arrest of Dante R. MCDONALD on July 31, 2024.

35.     The "**TARGET DEVICE**" is currently in storage at the Waukesha County Drug Task Force, 1400 Northview Rd., Waukesha, Wisconsin 53188, which is in the Eastern District of Wisconsin.  In my training and experience, I know that "**TARGET DEVICE**" has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the "**TARGET DEVICE**" first came into the possession of the DEA.

36.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the "**TARGET DEVICE**" described in Attachment A to seek the items described in Attachment B.

## TECHNICAL TERMS

37.     Based on my training and experience, I use the following technical terms to convey the following meanings:

> a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

16

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs.  Some PDAs also function as wireless communication

17

devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

38.   Based on my training, experience, and research, I know that the "**TARGET DEVICE**" has the capabilities that allow it to serve as a wireless telephone, digital camera,

portable media player, GPS navigation device, and PDA, and all have the ability to access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

39.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

40.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the "**TARGET DEVICE**" was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the "**TARGET DEVICE**" because:

      a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

      b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic

19

process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

41. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the "**TARGET DEVICE**" consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the "**TARGET DEVICE**" to human inspection in order to determine whether it is evidence described by the warrant.

42. *Manner of execution.* Because this warrant seeks only permission to examine the device once in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

20

<u>**ATTACHMENT A**</u>

**Property to Be Searched**

The property to be searched is described as follows: an Apple iPhone with an Apple logo on the back, and having a black Otterbox cover, hereinafter referred to as the "**TARGET DEVICE**" (<u>see</u> *Figures 1* and *2*).



| *Figure 1* | *Figure 2* |

The "**TARGET DEVICE**" is currently located at the Waukesha County Drug Task Force, 1400 Northview Rd., Waukesha, Wisconsin 53188, which is in the Eastern District of Wisconsin. This warrant authorizes the forensic examination of the "**TARGET DEVICE**" for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the "**TARGET DEVICE**," described in Attachment A, that relate to violations of 21 U.S.C. §§ 846, 843(b), and 841(a)(1) (i.e., the Subject Offenses), and involve Dante R. MCDONALD, including, but not limited to:

     a.  any documents and communication related to the Subject Offenses;

     b.  lists of contacts and related identifying information;

     c.  any information related to criminal activity and co-conspirators (including names, addresses, phone numbers, or any other identifying information);

     d.  any information recording schedule or travel;

     e.  all bank records, checks, credit card bills, account information, and other financial records;

     f.  Photographs and/or videos depicting evidence of the Subject Offenses;

     g.  Any evidence related to either the ownership, purchase, or possession of items used in the Subject Offenses;

     h.  Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses

2.      Evidence of user attribution showing who used or owned the "**TARGET DEVICE**" at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.